[No. F002863. Fifth Dist. Nov. 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY TOWERY et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III, V, VI, VII, VIII, and IX.

**COUNSEL**

Nancy Marsh and Eugene F. Toton, under appointments by the Court of Appeal, Richard M. Long, Smith & Dudley and Arthur Dudley for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Jane N. Kirkland and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### HAMLIN, Acting P. J.—

#### THE CASE

Six defendants were charged in a twenty-six-count information with conspiracy (Pen. Code, § 182, subd. 1)[1] to commit thefts of oil in Kern County. Defendant Lail Johnson was also charged with 12 counts of grand theft (§ 487, subd. 1) and 12 counts of receiving stolen property (§ 496). In addition to the conspiracy charge, defendant Jerry Towery was charged with two counts of grand theft, and defendant Joe Tony Samora was charged with six counts of grand theft. Of the remaining defendants, one pleaded guilty before trial, one was acquitted, and the charges against the third were dismissed; these three defendants are not involved in this appeal.

Following a jury trial, defendant Johnson was convicted of conspiracy and 12 counts of receiving stolen property; the jury found him not guilty of the 12 counts of grand theft. Defendant Samora was found not guilty of conspiracy but was convicted of six counts of grand theft. The jury found defendant Towery not guilty of conspiracy but guilty of two counts of grand theft.

The trial court granted defendant Johnson a new trial on the conspiracy charge, and the district attorney later dismissed that count. Defendant Johnson was sentenced to prison for the upper term of three years on one count of receiving stolen property, to consecutive eight-month terms on three other such counts, and the upper term of three years was stayed on the remaining eight counts, resulting in a total term of five years.

Defendant Towery was sentenced to prison for the midterm of two years on one count of grand theft and to two years on the other count, to be served concurrently. The court sentenced defendant Samora to prison for the midterm of two years on one count of grand theft and to two consecutive eight-month terms on two other such counts; two-year terms on the remaining three counts were stayed, resulting in a total term of three years, four months.

Defendants Johnson, Samora and Towery appeal, alleging the trial court erred (1) in admitting both tape recordings an informant made of his conversations with defendants and evidence of other crimes committed by defendant Johnson; (2) in refusing to dismiss the charges because of the gov-

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

ernment's outrageous conduct in involving the defendants in the oil theft operations; (3) in instructing the jury and in commenting to jurors when they were deadlocked; (4) in refusing to recuse the district attorney; and (5) in imposing sentence on defendants. We find defendants' contentions without merit and will affirm the judgment.

## THE FACTS

In September 1981, Charles David Conroy was working as a truck driver for defendant Johnson, owner of Johnson Brothers Trucking. Conroy was convicted of four felony counts and learned he was facing a four-year state prison sentence.[2] On the advice of his attorney, Conroy went to the Kern County Sheriff's Office and told them of "all the illegal activity I had been involved in." The meeting included Sergeant Condon, who was designated the investigating officer in this case. No promises were made to Conroy at that first meeting.

At a second meeting about one week later, Deputy District Attorney Steven Davis was present. Davis told Conroy that if Conroy cooperated with the police, he would try to get Conroy's sentence reduced to a year in county jail. He explained to Conroy that the actual sentencing decision would be that of the trial judge. Conroy was also told he would not be prosecuted for the numerous uncharged crimes he had discussed with the police.

Sergeant Condon told Conroy to return to his usual activities and, if contacted by any of the people with whom he had prior dealings or criminal contacts, to tape-record the conversations. Condon instructed Conroy to record "all telephone conversations involving any illegal activities during this period of time and that once that telephone tape was used, to turn it over to [him, Condon] immediately."

In the latter part of 1980, Conroy had obtained, and apparently held at the time of the instant events, a fuel broker's license issued by the State Board of Equalization. Conroy had a company by the name of Fuel Movers. During the operation with defendant Johnson, Conroy opened a checking account in the name of Fuel Movers at the request of defendant Johnson.

Knowing of Conroy's conviction, defendant Johnson approached Conroy about obtaining cheap diesel fuel; Conroy had not brought up the subject

---

[2]Details of the offenses for which Conroy was convicted, which appear to be identical to the offenses for which these defendants were prosecuted, can be found in this court's opinion in *People* v. *Kellett* (1982) 134 Cal.App.3d 949 [185 Cal.Rptr. 1]. Kellett was Conroy's codefendant whose four-year state prison sentence was affirmed.

prior to Johnson's inquiry. Through Tommy Gene Shelton, a truck driver for Mock Petroleum, Conroy was introduced to Richard Land. At the same time, Conroy gave Shelton $1,500 in cash for a load of diesel fuel; Conroy had obtained the money from Johnson. On October 23, 1981, Conroy and Johnson met and discussed whether Conroy could obtain a load of diesel fuel for Johnson.[3] Johnson was to pay between $4,000 and $4,500 for a load of diesel plus a $500 commission to Conroy; Conroy was making the arrangements to get the necessary trucking equipment (a "3-axle," a semi cab, and one or more pumps) to transport the fuel. Although Johnson had a truck capable of carrying the fuel, Johnson and Conroy agreed they did not want to use Johnson's truck since it was too well known. Johnson told Conroy he was using his own money for the diesel deal since he did not want his wife, who kept the books for Johnson Brothers Trucking, to know anything about it.

In a later phone call on October 23, Conroy and Johnson discussed getting a smaller load as well as using some temporary signs to cover Johnson's name on the Johnson Brothers truck. Johnson told Conroy, "Yeah, do that." In a telephone conversation on October 24, Conroy and Johnson made arrangements for Johnson to deliver an envelope to Conroy which Conroy needed before he could pick up the load of diesel. The envelope Conroy received from Johnson contained $4,000 in $100 bills.

At no time during this entire operation, which continued into January 1982, did Conroy ever succeed in obtaining a load of stolen diesel fuel for Johnson, although Conroy did pick up several loads of diesel from the refinery on Johnson's behalf, paying the full price for each with a Johnson Brothers Co. check. These were legitimate transactions and not the transactions referred to in any of the recorded telephone conversations.

Although Conroy believed he had two possible sources for stolen diesel fuel, Tommy Shelton and Rony Steele, Jr., the main problem in obtaining the diesel appeared to be one of security, a factor which was frequently discussed between Conroy and Johnson. For example, Conroy once told Johnson he had been unable to get the anticipated load of fuel because "the wrong guy" was on the scale, and Conroy stated he would rather be safe than sorry. When Conroy and Johnson discussed a load on October 28, the discussion encompassed the weight of the truck and the best route to take to avoid the highway scales.

---

[3]During this meeting and all subsequent face-to-face encounters with any of defendants, Conroy was wearing a "Fargo" recording device to tape-record the conversation. Telephone conversations were recorded at Conroy's home utilizing his personal recording equipment. All tapes, telephone or Fargo, were turned over to Sergeant Condon.

As early as October 28, Conroy mentioned to Johnson that he, Conroy, might have a deal going for "fuel oil," a heavy, low-grade fuel, also known as bunker fuel. Conroy told Johnson that Roman Oil Co. was a potential purchaser and that Roman Oil was aware "where it's coming from." In a later telephone conversation covering both the possible purchase of two loads of diesel at $4,500 per load and the transfer of one load of fuel oil to Roman Oil, Johnson asked Conroy if the fuel oil deal was "legit." When Conroy replied it was not, defendant asked Conroy why he didn't get some legitimate deals going. Johnson asked, "Is there a chance of gettin [sic] tail in a ringer [sic]?" In this same conversation, Conroy and Johnson discussed using a truck belonging to codefendant Charles Norris. Norris owed Johnson some money, and the tone of the conversation suggested Conroy should use this debt to compel Norris to permit the use of his truck.

On November 22, 1981, Conroy received a phone call from defendant Joe Tony Samora. Samora told Conroy he worked for Mock Petroleum and offered to sell Conroy a load of fuel oil. The two engaged in considerable discussion about being careful; additionally, Conroy asked Samora if Samora knew anyone hauling diesel, and the tone of the conversation indicated interest in a stolen load. Conroy and Samora also discussed other drivers who might be stealing oil. In a telephone conversation three days later, Samora told Conroy of his interest in stealing a load of fuel oil since he needed money for federal taxes.

At Johnson's request, Conroy got a price quotation from British Petroleum for the purchase of fuel oil. Conroy relayed this information to Johnson, and they also talked about "pumping off" a load of fuel oil from a Mock Petroleum truck. Again, the tone of the conversation suggested an illegal objective.

Conroy and Samora later made arrangements by telephone to meet at the Bonanza Cafe and transfer a load of stolen fuel oil from a Mock Petroleum truck, driven by Samora, to a truck supplied by Conroy. Conroy and Samora described themselves to each other prior to the meeting. Conroy then called the police and had himself fitted with a Fargo unit. He also called Johnson to arrange to get the money to buy the load. Johnson gave Conroy $2,500 in $100 bills. Conroy drove a Johnson Brothers truck, No. 857, and had the truck weighed empty, a "light weight" of 26,960 pounds. Conroy and Samora met at the Bonanza Cafe, connected their trucks, and began to pump oil from Samora's Mock Petroleum truck into the Johnson Brothers truck. At one point when Samora went back into the cafe to buy a cup of coffee, Conroy said to the policeman monitoring his conversation with Samora, "'We got it, we got it, we got it, we got it, Goddamn I been waitin'

for this day' [*sic.*] You guys had me worried fellas [portion of tape deleted by trial court at pretrial hearing]." However, during the pumping off process, the pump broke, and Conroy was not able to get all of the load from Samora's truck. When weighed again on the return trip to Bakersfield, Johnson Brothers truck No. 857 had a "heavy weight" of 33,850 pounds.

The procedure Conroy ultimately developed involved, for the most part, Charles Norris using his own truck to haul a 42-foot trailer belonging to Johnson. Norris would stop at a scale and get a light weight on the rig, then meet with Conroy and a Mock Petroleum driver and transfer a load of stolen fuel oil from the Mock Petroleum truck to the Johnson trailer. Norris would then obtain from Conroy a bill of lading with defendant Johnson's name at the top and get a heavy weight on the truck. Norris would finally deliver the load of fuel oil to British Petroleum, who would then pay Johnson per the bill of lading. Three drivers employed by Mock Petroleum were involved, Joe Tony Samora, Richard Land, and, in January 1982, Jerry Towery, known as Rollie. Grand theft charges were filed against each of them. Towery's nickname had come up in conversations between Conroy and Samora in early December, but Conroy and Towery did not make an actual transfer until January. The Mock Petroleum driver would receive $1,000 for the load of fuel oil, Charles Norris would be paid $400, and Conroy would ostensibly keep $500 for arranging the transaction, although Conroy actually turned this money over to the sheriff's department. Conroy also managed to keep one carbon of all the paperwork involved, which was also turned over to Sergeant Condon.

Frequently in the conversations between Conroy and the Mock Petroleum drivers, there was talk of the need to be very careful in stealing the fuel oil and in not stealing too much. It appeared from some conversations that other drivers, not connected with Conroy, were also stealing fuel oil, and while losses of 1,000 to 2,000 gallons might be written off by the refineries as clerical errors, serious discrepancies in excess of that amount would arouse suspicion. Moreover, when Conroy talked to Johnson in December 1981, Johnson again stressed to Conroy the desirability of getting some "legit" loads. However, Conroy testified that between October 1981 and January 1982 he never purchased any legitimate fuel oil on behalf of Johnson from the refineries, and the only fuel oil obtained was from the Mock Petroleum drivers. Conroy obtained no stolen fuel oil after January 11, 1982.

DISCUSSION

I. *Tape Recordings of Informant's Conversations With Defendants.*

All defendants contend that the trial court erred in ruling admissible the telephone tape recordings and the recordings monitored by Fargo unit be-

tween Conroy and them. Defendants challenge the admissibility of these tape recordings on three bases: (A) Conroy's consent to the recording was not voluntary, (B) Conroy was not acting under the direction of law enforcement agencies; and (C) the trial court erred in ruling the tapes admissible under the coconspirator exception to the hearsay rule.

A. *Informant's consent.*

 None of the defendants in this case dispute the well-established rule that a tape recording of a conversation between a criminal defendant and a third party *made with the voluntary consent of the third party* is admissible in a criminal proceeding. (See, e.g., *People* v. *Murphy* (1972) 8 Cal.3d 349, 359-361 [105 Cal.Rptr. 138, 503 P.2d 594]; *People* v. *Fulton* (1984) 155 Cal.App.3d 91, 100, fn. 6 [201 Cal.Rptr. 879]; *People* v. *Blend* (1981) 121 Cal.App.3d 215, 229 [175 Cal.Rptr. 263].)[4] Defendants nonetheless contend the tape recordings in this case were erroneously admitted since Conroy's consent was coerced. Defendant Johnson had challenged the admissibility of the tape recordings by a section 1538.5 motion in the trial court on this same ground. In denying that motion, the trial court stated in part: "Mr. Conroy's consent was free and voluntary. He approached the police and the District Attorney's Office, not the other way around. Although Mr. Conroy was undoubtedly highly motivated, this did not tarnish his free and voluntary consent to be an informant. Promises were made but no pressure was applied by the police."

 Defendants contend that Conroy's interest in avoiding a four-year prison sentence, and in gaining immunity from prosecution for other, similar acts with which he was not charged at the time he agreed to cooperate with the police, rendered his consent to cooperate involuntary. However, as this court recently pointed out in *People* v. *Blend, supra,* 121 Cal.App.3d at page 229, "[c]ooperation was not 'coerced' merely because Gray, the informant, found it to be in her own best interests to cooperate with those enforcing the law. [Citation omitted.]" Similarly, the court in *People* v. *Velasquez* (1976) 54 Cal.App.3d 695, 699 [126 Cal.Rptr. 656], rejected an argument that consent to monitor and record telephone conversations was

---

[4]This rule is consistent with the federal rule as an exception to the general requirement that wiretaps must be authorized by a warrant. (See 18 U.S.C.A. §§ 2510-2520, dealing generally with wire interception and interception of oral communications.) Although defendant Samora contends the tape recordings in the instant case violate these federal statutes, this contention ignores the express provision of 18 United States Code Annotated section 2511(2)(c), which provides, "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." (See also *People* v. *Montgomery* (1976) 61 Cal.App.3d 718, 731 [132 Cal.Rptr. 558].)

involuntary, holding that, "[w]hether the custody [of the witness] operated as a compulsion was a matter of fact for the trial court to resolve; its determination of that issue is binding on us. The only promise made to Miss Caico was that the officer would advise enforcement personnel and the courts of her assistance; no promise that she would receive immunity or favorable sentencing was made. The promise was not such as, as a matter of law, must be held coercive."

Defendants urge that the quoted language of the court in *People v. Velasquez, supra,* implicitly requires a determination of coercion, as a matter of law, when a promise of leniency in sentencing or immunity is made. However, in *People v. La Peluso* (1966) 239 Cal.App.2d 715, 723 [49 Cal.Rptr. 85], the court said with respect to such factors, "This is not to say that such factors would necessarily vitiate consent as a matter of law. A distinction must be drawn between motivation, which may be induced by proper representations, and consent which may then either be freely granted or grudgingly conferred. Where consent is freely granted, the fact that the special employee is under arrest for a narcotic violation and cooperates following assurances that the fact of cooperation will be made known to the United States Attorney's office, will not negative that consent. [Citation omitted.]"

Based on the cases reviewed, we conclude that the decision of the trial court on defendant's section 1538.5 motion was correct. As the trial court noted, Conroy, believing himself subject to a prison sentence of up to four years, voluntarily contacted the police, apprised them of the scope of his criminal activity, and offered to cooperate with them in their investigation of oil field thefts. Conroy had himself been on the receiving end of a similar deal, as a result of which Conroy's codefendant went to state prison for four years while the police "agent/informant" was granted immunity from prosecution for 10 to 12 oil field thefts. (See *People v. Kellett, supra,* 134 Cal.App.3d at p. 953.)

Admittedly, Conroy was highly motivated here to strike a deal with the authorities. However, his degree of motivation, high though it might have been, did not operate to divest Conroy of his right to freely and voluntarily consent to help the authorities. The trial court expressly found Conroy freely consented to the recording of telephone conversations and the monitoring and recording of face-to-face conversations. This finding is supported by substantial evidence that Conroy initiated contact with the authorities and offered his cooperation with hope of favorable treatment. (See, e.g., *People v. North* (1981) 29 Cal.3d 509, 513 [174 Cal.Rptr. 511, 629 P.2d 19].) We therefore conclude that the trial court properly rejected defendants' argument that Conroy's consent was coerced and involuntary.

B. *Acting Under Direction of Law Enforcement Officers.*

■ Defendants also urge that the recorded conversations should have been excluded pursuant to section 632, subdivision (d), pertaining to eavesdropping on or recording confidential communications. That subdivision provides, "Except as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative or other proceeding." Defendants acknowledge an exception to this provision in section 633: "Nothing in Section 631 or 632 shall be construed as prohibiting the Attorney General, any district attorney, or any assistant, deputy, or investigator of the Attorney General or any district attorney, or any officer of the California Highway Patrol, or any chief of police, assistant chief of police, or policeman of a city or city and county, or any sheriff, under sheriff, or deputy sheriff regularly employed and paid as such of a county, or any person acting pursuant to the direction of one of the above-named law enforcement officers acting within the scope of his authority, from overhearing or recording any communication which they could lawfully overhear or record prior to the effective date of this chapter.

"Nothing in Section 631 or 632 shall be construed as rendering inadmissible any evidence obtained by the above-named persons by means of overhearing or recording any communication which they could lawfully overhear or record prior to the effective date of this chapter."

Defendants have not cited and we have not found any case directly discussing the meaning of the phrase in section 633, "pursuant to the direction of one of the above-named law enforcement officers acting within the scope of his authority." In 55 Ops.Cal.Atty.Gen. 151 (1972) the opinion stated that inspectors for the Bureau of Food and Drug Inspections were not among those listed as "law enforcement officers" in section 633 and thus could only use electronic eavesdropping equipment under the direction of a designated law enforcement officer. The opinion then noted: "It has also been asked what the phrase 'under the direction' means. While it might be difficult to give a precise statement as to what would amount to 'direction' any problems that might arise can be obviated by simply having one of the officers mentioned in section 633 supervise the eavesdropping operation and specifically direct that the desired electronic device be used." (*Id.*, at p. 154.)

The focus of defendants' challenge goes to the recordings of telephone conversations made by informant Conroy from his home telephone and utilizing his personal recording equipment. Conroy testified he had the micro-

phone for some eight years prior to the events in question, but the tape recorder he used was a new one, purchased from Radio Shack, when he determined his existing tape recorder was inoperable. He advised Sergeant Condon that he had this equipment. Consequently, Condon did not provide him with eavesdropping/recording equipment owned by the police department. Condon did supply Conroy the tapes on which Conroy recorded, and these tapes were turned in to Sergeant Condon on a regular basis, usually within a day of recording and never more than three days from the time the tape was completed. Condon had directed Conroy to record all telephone calls dealing with the subject matter of stolen oil, and Conroy testified that he recorded most of the telephone conversations he received pertinent to the ongoing investigation. Conroy, who maintained the recording equipment on a telephone in his bedroom, admitted that some conversations dealing with the subject matter were not recorded. These failures to record occurred when someone involved in the thefts was at Conroy's home at the time a call was received.

It is this lack of *direct* police control over Conroy's recording of which defendants complain, i.e., there was no police officer in Conroy's home when a recording was being made nor was Conroy required to make the phone calls from a designated line in the police station. They argue that without such direct supervision Conroy could manipulate the recordings, either by erasing portions of conversations or electing not to record certain conversations altogether. Defendants contend this lack of police supervision over the recordings should render them inadmissible. We disagree.

On cross-examination, Sergeant Condon was questioned about the recording procedure in this case. He testified that one or two of the informants he had used in the past had made phone calls which were either monitored by the police and/or used as evidence in court. In the cross-examination by counsel for defendant Norris, Condon explained why it was neither feasible nor desirable to require Conroy to make all outgoing telephone calls from the offices of the sheriff's department. That cross-examination is set forth in the margin.[5]

---

[5]"Q. Is it true that those other one or two informants who did use the phone to make phone calls for tape recording purposes called from the Sheriff's Department Office rather than from their home?

"A. It's from the office or a location where we were and could tape record off of that phone, yes.

"Q. So, in other words, those particular instances you had control over not only what the person was saying, right?

"A. Yes.

"Q. You also had immediate control of the tape so that it couldn't be altered, erased or

In *People* v. *Brandow* (1970) 12 Cal.App.3d 749 [90 Cal.Rptr. 891], a prostitute agreed to cooperate with the police in a crackdown on criminal pandering, pimping, and prostitution. A police officer furnished her "with a tape recorder and she thereafter regularly recorded the conversations of various individuals who called on her private unlisted telephone line. She was visited almost daily by [that officer] who reviewed with her the contents of the tape recordings and the events since his last visit." (*Id.*, at p. 752.) The informant succeeded in obtaining 45 identifiable tape recordings. These tape recordings were played in court, while transcripts of the recordings, which had been verified as to accuracy by the witness, were furnished to the jury. In rejecting the defendant's claim that the surreptitious tape recordings constituted an illegal search, the court noted that the Supreme Court recognized the Fourth Amendment does not protect a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. (*Id.*, at p. 753; see also *People* v. *Caravella* (1970) 5 Cal.App.3d 931, 933-934 [85 Cal.Rptr. 576].)

This rationale is equally persuasive in the instant case. Although Sergeant Condon had not furnished defendant the recording equipment, Condon and Conroy discussed this equipment, and Conroy advised Condon he already possessed the necessary machinery to tape-record telephone conversations.

---

in any way defaced. Isn't that true?

"A. That's true.

"Q. Most probably you could have a better quality of tape using your equipment under controlled circumstances where like Mr. Conroy in his own home he has children there that are possibly running in and out and so forth?

"MR. DAVIS: Objection. Assuming evidence not in evidence. Speculative and not relevant.

"THE COURT: Sustained.

"MR. HUFFMAN: Q. Why was it in this particular case that you decided to allow Mr. Conroy to make his own tape recordings at home rather than doing it as you had in the past from the Sheriff's Offices?

"A. Well, this was going to be a different type of circumstance and when he received phone calls which he did, he definitely couldn't use the Sheriff's Office number to reach him at and the second thing is he was making phone calls in the morning, noon and night from his residence and it just really wasn't feasible to set him up an office or telephone at the Sheriff's Office to be utilized for these tape recordings.

"Q. Okay. Now, I can understand incoming calls be required to be going through his phone but the outgoing calls, the Sheriff's Department is open 24 hours a day, is it not?

"A. That's correct.

"Q. Okay. If you were not yourself personally on duty, there are other officers who could be given instructions that, hey, if Mr. Conroy wants to make a phone call, make sure it is properly recorded and give me a tape later. You could have done that?

"A. You could take people from other assignments and have them come in to do that but that's not normal. That would not be normal procedure.

"Q. But we don't always have to go by normal procedure, do we?

"A. I try to as much as you can with the informant.

"Q. What I am saying is it was possible that on outgoing calls all of those could have been monitored by the Sheriff's Department by having him call from the Sheriff's Department. Isn't that correct?

"A. It's possible. It just wasn't feasible and it was not desirable from our standpoint."

The tapes Conroy used were furnished by the police department and, upon their return, were "punched out" so they could neither be recorded over nor erased. Condon's explanation for permitting defendant to record these conversations from his home telephone is reasonable, i.e., at least some of the people from whom the police expected Conroy to receive calls had had prior dealings with him, and a sudden change in telephone number might create suspicion. This is factually similar to the situation in *People* v. *Brandow, supra,* 12 Cal.App.3d 749 involving a prostitute with an existing clientele.

We believe the looseness of law enforcement direction to Conroy in making the tape recordings properly goes to the weight given to those recordings and not their initial admissibility. No counsel was precluded at trial from questioning Conroy or Condon about the manner in which the tapes were made, nor were they precluded from arguing to the jury that Conroy, with his significant motivation in cooperating with the police, might have altered the tapes to further his own interest.

■■ Finally, defendants contend admission of the tape recordings violated their Fifth Amendment right to remain silent as well as their Sixth Amendment right to assistance of counsel. These arguments were rejected by the California Supreme Court in *People* v. *Murphy, supra,* 8 Cal.3d 349, and we adopt its rationale. Recording of conversations with defendants under the circumstances of this case does not involve the custodial interrogation with which *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] is concerned. Neither did the recordings in this preindictment setting result in denial of defendants' right to counsel. (*People* v. *Murphy, supra,* at pp. 361-362.)

C. *Conspirator Exception to Hearsay Rule.*

■ Defendant Johnson urges that the trial court erred in ruling, over a hearsay objection, that the taped conversations between Conroy, defendant Johnson, and the various other codefendants in this case were admissible pursuant to Evidence Code section 1223. That section provides:

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;

"(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and

"(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

It is well settled that statements of coconspirators may be admitted pursuant to Evidence Code section 1223 upon a *prima facie* showing of the conspiracy which may be based on circumstantial evidence tending to show that a conspiracy existed. (See, e.g., *People* v. *Jourdain* (1980) 111 Cal.App.3d 396, 405 [168 Cal.Rptr. 702]; *People* v. *Lipinski* (1976) 65 Cal.App.3d 566, 575 [135 Cal.Rptr. 451].) As the court pointed out in *People* v. *Earnest* (1975) 53 Cal.App.3d 734, 741 [126 Cal.Rptr. 107], "The foundational requirement may be met without establishing a conspiracy beyond a reasonable doubt or even by a preponderance of the evidence; only prima facie evidence of the fact is required. [Citation omitted.]" In the pretrial hearings in this case, the trial court listened to lengthy arguments on this issue and concluded: "After listening to several days of the facts and the arguments, it is my conclusion there are, under the guidelines, sufficient preliminary facts to establish a conspiracy. That is sufficient under the Evidence Code and the cases to enable the People to proceed in front of a jury with the admission or statements of conspirators or co-conspirators."

 Defendant Johnson argues that, since the evidence at trial established each of the defendants talked to Conroy and there was no evidence to indicate the various codefendants talked to one another,[6] Conroy's status as a police agent precluded a conspiracy as a matter of law. Thus, defendant argues, there could be no statements of "coconspirators," and the trial court erred in ruling Conroy's tape recordings admissible under this exception to the hearsay rule. Defendant Johnson places great reliance upon *King* v. *State* (Fla. 1957) 104 So.2d 730, in which the court held in part, "where two or more persons conspire with another who is, unknown to them, a government agent acting in the line of duty, to commit an offense under an agreement and an intention that an essential ingredient of the offense is to be performed by, and only by, such government agent, such persons may not legally be convicted of a conspiracy." (*Id.*, at p. 733.) Even were we to accept that the rationale of *King* v. *State* would preclude, as a matter of law, the prima facie showing of conspiracy required to admit statements of coconspirators

---

[6]Our review of the record establishes that although Johnson may have talked only to Conroy, the other charged coconspirators did talk to one another. On those occasions when an actual transfer of stolen fuel oil was made, the Fargo recordings show that, e.g., on December 17, 1981, Conroy, Norris, and defendant Samora talked together while a load of oil was being pumped from Samora's truck to that of Norris; on January 3, 1982, a similar conversation was recorded between Conroy, Norris, and defendant Towery.

over a hearsay objection, we are not persuaded that case is controlling on the facts now before us.

Initially, the court in *King* v. *State* recognized that "[b]oth an agreement and an intention to commit an offense are necessary components of the substantive offense of conspiracy." (*Id.*, at p. 732.) The distinction between the *agreement* and the underlying *offense* is a critical one in the instant case. In *King* v. *State, supra,* the defendants were police officers convicted of conspiring to make book and to maintain a place for the purpose of gambling. The police agent in that case was paid by law enforcement to set up the gambling establishment and instructed to make book; when the officers raided the gambling parlor on an anonymous tip (actually made by the agent), an arrangement was struck for weekly payoffs to the police officers. Interestingly, the officers had been tried and acquitted for the substantive offense of accepting unauthorized compensation for the nonperformance of their duty.

Clearly, if the members of an alleged conspiracy *intend* that an essential ingredient of the substantive offense be committed by, and only by, a government agent, the conspirators are not legally guilty of conspiracy since the government agent cannot be criminally liable for an offense committed in the performance of his duty. This is the rule of *King* v. *State, supra;* it does not apply to the facts of the instant case. Here, defendants Johnson, Samora, and Towery, as well as Charles Norris and Richard Land (charged as conspirators in the original information), were charged with conspiracy to commit grand theft. No essential ingredient of the *substantive offense* had to be performed by the government agent, Conroy. Since the government's agent was not required to perform any essential ingredient of the offense, the crime of grand theft could be committed, and, in fact, Samora and Towery were properly convicted of committing it.

Nor are we persuaded that the rule of *King* v. *State* should be extended to encompass situations like that now before this court simply because a government agent has been the conduit through which the unlawful agreement has passed. We are mindful of the posture in which this issue is presented to us: since we are only called upon to decide if the trial court properly found a prima facie showing of conspiracy sufficient to admit out-of-court statements over a hearsay objection, defendant Johnson's argument would have us hold that Conroy's involvement vitiates the criminality of this agreement to steal and resell fuel oil as a matter of law.

■ Since it is unnecessary that the various members of a conspiracy meet or even know each other in order for circumstantial evidence to establish the existence of an agreement, there seems little logical reason to ex-

clude statements made by various persons, all of whom are shown by circumstantial evidence to be participants in a conspiracy to accomplish a criminal end, simply because these various persons were not speaking to one another but to a third party. As the court pointed out in *People* v. *Lipinski:* "It is likewise well recognized that the very crux of the conspiracy, the evil or corrupt agreement [citations omitted], may be shown also by circumstantial evidence. Thus, it is not necessary to prove that the parties met and actually agreed to perform the unlawful act or that they had previously arranged a detailed plan for its execution. Rather significantly, *the agreement may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute* [citations omitted]. . . . [T]he sufficiency of evidence relative to the establishment of a conspiracy must be viewed against the background of the type involved, and ' "*If there be knowledge by the individual defendant that he is a participant in a general plan designed to place narcotics in the hands of ultimate users,* the courts have held that *such persons may* be deemed to *be regarded as accredited members of the conspiracy.*" ' [Citations omitted.]" (*People* v. *Lipinski, supra,* 65 Cal.App.3d at pp. 575-576; see also *People* v. *Morales* (1968) 263 Cal.App.2d 368, 376-377 [69 Cal.Rptr. 402].)

■ The court in *People* v. *Jourdain, supra,* 111 Cal.App.3d 396 noted the preliminary facts which the prosecution must establish for the coconspirators exception to the hearsay rule are: (1) the declaration was made by the declarant during his participation in the conspiracy, (2) the declaration was made in furtherance of the conspiracy, and (3) the party against whom the statement is offered was, or would become, a participant in the conspiracy. There is clearly no requirement that a statement must be between the coconspirators to be admissible under this exception. The fact that Johnson made statements to Conroy but not, so far as the record shows, to Samora, Towery, Norris, or Land, is not determinative so long as the court found a sufficient prima facie showing that Johnson was a participant in a conspiracy, the statements challenged were made during his participation in the conspiracy, and the statements were made in furtherance of the conspiracy.

The fact that a declarant has made a statement to a law enforcement operative, whether undercover officer or informant/agent, does not preclude admissibility of the statement under Evidence Code section 1223 so long as those foundational facts summarized above have been satisfied. The trial court did not err in ruling the recordings fell within a recognized exception to the hearsay rule. Moreover, to the extent the recordings contained statements by Conroy himself which expressly or impliedly named defendant Johnson as the man behind the operation, any arguable error by the trial

court in failing to delete these comments in order to preserve the sense of the entire conversation does not demand reversal. Given the weight of the evidence against defendant Johnson, it is not reasonably probable a result more favorable to him would have been reached if Conroy's inculpatory statements had been deleted. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

We conclude that the trial court did not err in admitting the tape recorded statements of police informant Conroy with defendants Johnson, Samora and Towery.

## II. *Government Conduct.*

Both defendant Johnson and defendant Towery argue that the involvement of law enforcement officers with this oil theft operation through the informant, Conroy, was so pervasive that prosecution of these defendants for offenses set up by a government agent denied defendants due process of law. ▮▮ ▮▮▮ Although defendant Johnson refers to the California law on the defense of entrapment (see, e.g., *People* v. *Barraza* (1979) 23 Cal.3d 675, 689-690 [153 Cal.Rptr. 459, 591 P.2d 947]),[7] it appears from their arguments that these defendants recognize entrapment is a defense which the jury clearly rejected as to both of them. The jury was properly instructed on the defense of entrapment in accordance with *People* v. *Barraza, supra* (see, e.g., *People* v. *Arthurlee* (1985) 168 Cal.App.3d 246, 250-252 [214 Cal.Rptr. 5]) and sought reinstruction on the defense as well as the replay of various crucial tape recordings. However, even conceding that the jury rejected their entrapment defense, defendants assert this does not preclude them from raising a due process violation based on the outrageousness of the government conduct in connection with the criminal activity.

▮▮ Defendants rely upon a line of federal authority rooted in *United States* v. *Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637]. There, the United States Supreme Court adopted a subjective test for determination of entrapment, focusing upon the predisposition of the defendant to commit the offense charged. This clearly differs from the objective test employed in California and discussed herein. However, notwithstanding the

---

[7]"For all the foregoing reasons we hold that the proper test of entrapment in California is the following: was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense? For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime." (*Ibid.,* fn. omitted.)

employment of a subjective test and consequent rejection of Russell's contention that he had been entrapped, Justice Rehnquist writing for the majority noted, "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." (*Id.,* at pp. 431-432 [36 L.Ed.2d at p. 373].)

In *Russell* the government agent, assigned to locate an illicit methamphetamine laboratory, contacted the defendant and two companions and told them he represented a large organization interested in controlling the illicit drug manufactured in the area. The agent offered to supply the defendant with the chemical phenyl-2-propanone, a chemical necessary in the manufacture of methamphetamine and the chemical most difficult to obtain. In return, the agent insisted he be shown a sample of the drug as well as the laboratory where it was produced. The Supreme Court determined not only that defendant's entrapment defense was properly rejected but that this level of government involvement did not reach the "outrageousness" necessary to constitute a due process violation. (*People* v. *Russell, supra,* at p. 432 [36 L.Ed.2d at p. 373].)

Similarly, in *Hampton* v. *United States* (1976) 425 U.S. 484 [48 L.Ed.2d 113, 96 S.Ct. 1646] the Supreme Court rejected a due process claim based on outrageous government conduct when a government informant had assisted the defendant in two sales of heroin. Recognizing that the government involvement in *Hampton* was greater than that of the agent in *Russell*, the Supreme Court nevertheless held, "[b]ut in each case the Government agents were acting in concert with the defendant, and in each case either the jury found or the defendant conceded that he was predisposed to commit the crime for which he was convicted." (*Id.,* at pp. 489-490 [48 L.Ed.2d at p. 118].) The court then concluded: "The limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the *defendant*. Here, as we have noted, the police, the Government informant, and the defendant acted in concert with one another. If the result of the governmental activity is to 'implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission . . . ,' [citation omitted], the defendant is protected by the defense of entrapment. If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law. [Citations omitted.] But the police conduct here no more deprived defendant of any right secured to him by the United States Constitution than did the police conduct in *Russell* deprive Russell of any rights." (*Id.,* at pp. 490-491 [48 L.Ed.2d at p. 119].)

Thus the Supreme Court, while recognizing the possibility of a due process violation requiring reversal of a conviction, has never found facts adequate to justify the result. Defendants point to a number of lower federal court cases in which outrageous government conduct was found; all these cases are factually distinguishable from the instant case. For example, in *United States* v. *Batres-Santolino* (N.D.Cal. 1981) 521 F.Supp. 744, there was no indication that either of the defendants "had ever been involved in drug smuggling or distribution or that they were ever involved in criminal activity." (*Id.*, at p. 752.) One of the defendants had to ask the government agent "for tips on how to organize the distribution of the cocaine in the United States. Moreover, no criminal enterprise involving defendants existed until Bryan Thomas' actions prompted them to create one. Finally, the defendants had no organization or ability to smuggle the drugs into the United States. So again, the government obliged them and arranged that part of the enterprise as well. [¶] Thus, this is a case in which the government supplied all the drugs *and* defendants were not involved in a drug-related enterprise until the government agent came on the scene." (*Ibid.*) The court then concluded: "Prior cases in which government agents have contributed materials, labor, or planning skills in order to infiltrate a criminal enterprise, or have made threats to recalcitrant coconspirators in order to play out their undercover roles, simply are not comparable. This court recognizes that there are few cases in which the outrageous government conduct challenge has prevailed. There are few cases where the government has so clearly exceeded the bounds of permissible law enforcement conduct. Permissible conduct has been described as that which, even with the use of stealth and subterfuge, is designed to expose illicit traffic, illegal conspiracies, violations or would-be violations of the law and to prevent crime. [Citation omitted.] However, this is not a case where the government is ferreting out ongoing criminal activity. It is a case where the government, through its agent, went about putting persons into the business of crime for the first time." (*Ibid.*)

Similarly, in *United States* v. *Twigg* (3d Cir. 1978) 588 F.2d 373, the government informant, a convicted felon seeking to reduce the severity of his sentence, (1) contacted the defendants and suggested the illegal drug enterprise, (2) arranged for the government to supply much of the equipment and a hard-to-obtain chemical free of cost to the defendants when it was not apparent they could have afforded the initial investment, (3) arranged through the Drug Enforcement Administration to facilitate procurement of other necessary chemicals and actually purchased all of the supplies, (4) obtained an isolated location for the laboratory at no cost to the defendants, and (5) provided all of the expertise and "know-how" to manufacture the drug. The only "predisposition" manifested by the defendants was their

acquiescence in the proposal and the informant's testimony that he had worked with one of the defendants in a similar lab some four years earlier.

In *People* v. *Isaacson* (1978) 44 N.Y.2d 511 [406 N.Y.S.2d 714, 378 N.E.2d 78] the defendant, a graduate student and teacher at Pennsylvania State University about to receive his doctorate, was importuned repeatedly by a former student to assist the student in obtaining some cocaine. The student persisted despite the unwillingness of the defendant to furnish the drug, and the defendant testified the informant "cried and sobbed on the phone, relating that he was facing 15 years to life in Attica [for a drug conviction], that his parents had effectively cast him from the family home, that he was running out of friends, and that he was looking for ways to make money to hire a decent lawyer." (*Id.*, at p. 716.) When the defendant finally agreed to sell the informant the drugs, the defendant specified the sale take place in Pennsylvania to avoid the possibility of prosecution under New York's harsh drug laws. With the cooperation of government authorities, the informant tricked the defendant into the State of New York where the sale and subsequent arrest occurred. (See also *Greene* v. *United States* (9th Cir. 1971) 454 F.2d 783, 786-787.)

Under the authorities reviewed, the facts of this case do not support a finding that the government agents planted the seeds for criminal activity in completely innocent minds. Neither was the government's involvement in the criminal activity so pervasive as to render prosecution of the defendants otherwise violative of due process. It certainly appears from the record, as well as the published opinion in *People* v. *Kellett, supra,* 134 Cal.App.3d 949 that oil field thefts in Kern County were an ongoing problem and one about which law enforcement authorities were seriously concerned. Sergeant Condon testified he was in charge of a specific unit directed to this offense. In making his offer of cooperation to the police, Conroy indicated to them he had been involved in as many as 100 prior thefts before he was arrested and convicted as discussed above, up to 45 of which had also involved defendant Johnson. Returning Conroy to the environment from which his conviction had effectively removed him with instructions to let it be known he was back in the business is hardly the equivalent of government agents suggesting crime, contributing material, labor or skills to facilitate crime, or coercing reluctant participants to cooperate in their efforts.

In the first taped conversation between Conroy and defendant Johnson, the obvious tone of their conversation about obtaining a load of diesel oil suggested the deal was not legitimate. In later conversations, Johnson even inquired of Conroy if the deals on fuel oil Conroy was obtaining were legitimate and, when told they were not, urged Conroy to get some legiti-

mate deals going, although Johnson never instructed Conroy to cease the illegitimate activities.

Similarly, the record reveals in the first conversations between Conroy and defendant Samora and between Conroy and defendant Towery that both defendants, drivers for Mock Petroleum, seemed fully aware of the nature of the offer they were making to Conroy, i.e., to deliver to him a stolen load of fuel oil. Admittedly Conroy let it be known he was "back in the business," admittedly he paid Tommy Shelton a "commission" of $100 for each driver Shelton introduced to Conroy, and Conroy clearly asked Land (the defendant who pleaded guilty) and defendant Samora on several occasions whether "Rollie" (defendant Towery's CB nickname) was going to participate. However, this constituted nothing more than providing an opportunity to commit crime, permissible in any of the cases reviewed, and not the outrageous government conduct which constitutes a due process violation and requires reversal of the conviction.

We therefore reject the arguments of defendants Johnson and Towery on this issue.

III. *Trial Court's Comments to Jurors.**

. . . . . . . . . . . . . . . . . . . . . . .

IV. *Stolen Property Convictions of Defendant Johnson.*

Defendant Johnson contends the highest crime for which he could have been convicted was an attempt to receive stolen property since the oil stolen by the Mock Petroleum Company drivers was, in effect, "recovered" by Conroy, as an agent of law enforcement, and therefore lost its character as stolen property. The People counter that neither the police nor Conroy ever actually recovered or had possession of the stolen oil and therefore the oil which had been stolen from Mock Petroleum, for example, was still stolen property when it was delivered to British Petroleum Company and payment made to defendant Johnson.

We have found no California case squarely addressing the issue thus presented, i.e., whether use by law enforcement of a "feigned accomplice" in an ongoing undercover operation involving theft divests the stolen property of its "stolen" character so that it is factually impossible for the ultimate receiver to do more than *attempt* to receive stolen property. De-

---

*See footnote on page 1114, *ante*.

fendant Johnson relies upon the line of California cases originating with *People* v. *Camodeca* (1959) 52 Cal.2d 142 [338 P.2d 903] which supports a finding of criminal liability for an attempted offense when the actual commission of the offense is thwarted because some fact or circumstance is unknown or misunderstood by the actor. Of particular significance to defendant's argument is the decision of the California Supreme Court two years later in which the court rejected a defendant's contention that he could not be convicted of attempting to receive stolen property because the property he received was property the police had recovered. In *People* v. *Rojas* (1961) 55 Cal.2d 252, 257-258 [10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252], the court stated in part:

". . . [T]he defendants had the specific intent to commit the substantive offense and . . . under the circumstances as the defendants reasonably saw them they did the acts necessary to consummate the substantive offense; but because of circumstances unknown to defendants, essential elements of the substantive crime were lacking. . . .

"In the case at bench the criminality of the attempt is not destroyed by the fact that the goods, having been recovered by the commendably alert and efficient action of the Los Angeles police, had, unknown to defendants, lost their 'stolen' status, . . . In our opinion the consequences of intent and acts such as those of defendants here should be more serious than pleased amazement that because of the timeliness of the police the projected criminality was not merely detected but also wiped out."

Factually, of course, the instant case differs markedly from *People* v. *Rojas, supra,* in which case the police, with no apparent prior knowledge of the criminal activity, arrested one William Hall and seized a large quantity of electrical conduit which had been stolen the previous evening. Hall then told the police about the intended receivers and made arrangements, with knowledge of the police, to proceed with delivery of the stolen conduit, resulting in the arrest and conviction of the defendant and a cohort for receiving stolen property. Since the stolen conduit had been recovered by the police, it was not stolen property at the time it was delivered to the defendant; thus because of circumstances unknown to the defendant, an essential element of the offense, i.e., the "stolen" character of the conduit, was lacking. The defendants' convictions for receiving stolen property were modified to attempting to receive stolen property.

Analogizing to the facts of *Rojas,* defendant here argues that the involvement of the police in this protracted "sting" operation gave law enforcement *constructive* possession of the stolen property sufficient to divest it of its stolen character before it reached British Petroleum. Clearly the crime of

theft had been completed when any of the Mock Petroleum drivers involved met with Conroy and transferred a load of stolen fuel oil to a truck under Conroy's control. Moreover, according to Conroy's testimony the police were always near enough to the site of the transfer to permit them to monitor Conroy's conversation with the driver via the Fargo unit. Thus defendant argues it was unnecessary for the police themselves to actually take physical possession of the stolen fuel oil, merely to release it immediately in order to reach the other end of the illegal operation. Defendant contends the rationale of *Rojas* was satisfied when the police, with the ability to do so, failed to seize the stolen property and arrest the thief, i.e., the action of law enforcement in this case was the functional equivalent of releasing a thief with the recovered stolen property in order to catch the intended receiver. We disagree.

Although California courts have not addressed this issue, we are guided by decisions of the federal courts and of other state courts which decline to extend the rule discussed above beyond those cases in which the police have actually recaptured stolen goods and held them as agents of the true owner. In *United States* v. *Dove* (4th Cir. 1980) 629 F.2d 325, the Federal Bureau of Investigation embarked upon an undercover investigation of trafficking in stolen automobiles. The FBI was aided in its efforts by one Baker (whose alternative to cooperation was prosecution). The FBI set Baker up with a used car lot and maintained surveillance of activity at the car lot as well as frequent contact with and direction to Baker. Baker actually assisted one Hutto in the theft of two bulldozers which Hutto sold to defendant and another; Baker was present at the sales. The FBI had directed Baker to assist Hutto in stealing anything Hutto wanted to steal but not to initiate any criminal activity.

In affirming the defendant's conviction for possession of stolen property, i.e., one of the stolen bulldozers, the court stated in part: "In applying this body of law we do not pretend that the cases speak with one voice and make inevitable the result we reach. We look instead to the purpose of the rule and of the distinction between 'recovery' and 'observation.' There must come a time when goods recaptured by the police cease being 'stolen' in contemplation of the law. On the other hand, that principle should not be applied in such a way that 'the difficulties in apprehending criminals in cases such as this would be immeasurably increased, and without reason.' [Citation omitted.]

"With respect to the two bulldozers, we agree . . . that stolen property does not lose that status because of the participation of an undercover agent in the crimes of another. Baker was at all times acting under the general criminal design of Hutto. Baker's possession of the bulldozers, whether or

not in the immediate presence of Hutto, was not recovery for the owner but part of that criminal design. The conduct of Baker in the theft and sale of the bulldozers should be viewed as a form of observation." (*Id.*, at pp. 328-329.) (See also *United States* v. *Muzii* (2d Cir. 1982) 676 F.2d 919; *State* v. *Overton* (1965) 2 Ariz.App. 376, 409 P.2d 92.)

The facts in *United States* v. *Dove, supra,* 629 F.2d 325, are so like those of the instant case we find its reasoning persuasive. Like large scale trafficking in stolen automobiles in *Dove,* thefts from the oilfields in Kern County had reached such proportions at the time of Conroy's initial arrest (see *People* v. *Kellett, supra,* 134 Cal.App.3d 949), Sergeant Condon headed a special taskforce devoted to this crime. The nature of the offense involved financial backers on the one hand willing to put up the money to purchase stolen oil and drivers for refineries on the other hand willing to steal the oil in the first instance. To effectively disrupt this type of criminality, the police must reach toward both ends of the chain. Removing one or two dishonest drivers or arresting one financial backer will do little, if anything, to put a stop to the ongoing criminal conduct. It is precisely the nature of this criminal activity which justifies the police involving themselves in it surreptitiously or through informer/agents and in permitting criminal conduct to be carried on for almost two months. Were police activity like this *unnecessary* to disrupt a large crime ring, this court might be faced with the kind of outrageous government involvement which would constitute the deprivation of due process discussed above.

Moreover, the particular facts of this criminal enterprise highlight the unnecessarily increased difficulties which would be faced by law enforcement were this court to accept defendant Johnson's analogy to the rationale of *People* v. *Rojas, supra.* This is not a case where the police were merely interested in arresting a "fence" who would himself receive and take possession of the stolen property. Johnson had no interest in fuel oil, he had no use for it in his business, and there was never any contemplation that Johnson would receive, hold, or conceal the actual property. Defendant Johnson's only interest was in the profit to be made from selling the fuel oil. His criminal activity was directed to that end. Whether or not the police knew of Johnson's complicity in the scheme, proof of his involvement required them to permit the stolen fuel oil to proceed to its intended destination. Like the activities of the FBI in *United States* v. *Dove, supra,* the police in this case merely observed the stolen property incident to the ongoing investigation; like the activities of Baker, the "agent" in *Dove,* Conroy's involvement was not recovery of the oil on behalf of the rightful owner, Mock Petroleum, but was part and parcel of defendant Johnson's criminal design.

Finally, we note that the rule of *People* v. *Rojas, supra,* reduces the degree of criminal responsibility for a receiver of stolen but recovered property not because the perpetrator's culpability is lessened but because the legal doctrine of factual impossibility compels the result. In the more common setting when the thief is apprehended with the goods *after* the theft and subsequently cooperates with the police to catch the intended receiver, the diminished criminal·liability of the receiver, compelled by a settled rule of law, does not offend our sense of equal treatment for persons equally culpable. However, when, as in the instant case, the receiver *and* the thief are caught in the same net, application of the rule urged by defendant Johnson would leave us with this anomaly: Since no doctrine of "factual impossibility" operates to reduce the crime of grand theft to an attempt when law enforcement, for legitimate purposes, knows of but fails to stop commission of the offense, Johnson's codefendants, the Mock Petroleum drivers Towery and Samora remain fully liable for their criminal actions. Johnson, however, would receive the benefit of this legal doctrine, lessening his criminal responsibility from that of receiver of stolen property to merely one who attempted to commit the offense, despite his obvious role as the linchpin of this entire criminal enterprise. Nothing in established law requires us to reach such an inequitable result.

We therefore conclude defendant Johnson was properly convicted of receiving stolen property.

### V-IX*

. . . . . . . . . . . . . . . . . . . . . . . .

The judgments as to all defendants are affirmed.

Martin, J., and Ritchey, J.,† concurred.

A petition for a rehearing was denied December 24, 1985, and appellants' petitions for review by the Supreme Court were denied March 12, 1986.

---

*See footnote on page 1114, *ante.*
†Assigned by the Chairperson of the Judicial Council.