IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-3573

------------------------------------

United States of America,

Plaintiff-Appellee,

versus

Douglas D. Green,

a/k/a/ Doug Green,

Defendant-Appellant.

------------------------------------------------------

Appeal from the United States District Court

for the Eastern District of Louisiana
------------------------------------------------------

(June 15, 1992 )

Before  WISDOM, REYNALDO G. GARZA and JONES, Circuit Judges

GARZA, REYNALDO G., Circuit Judge:

Appellant Douglas D. Green (Green) challenges his

convictions for mail fraud, conspiracy to commit mail fraud

and money laundering and the sentences imposed.  For the

following reasons, we AFFIRM Green's convictions and

sentences.

## The Facts

"They say the gods themselves/ Are moved by gifts, and

gold does more with men than words."[1]

Appellant Green was elected to the position of Commissioner of Insurance for the State of Louisiana in October of 1987. He took office in March of 1988. The facts of his election campaign and his conduct while in office bear witness to the unfortunately continuing truth of the words spoken by Euripides almost 2,500 years ago.

In the fall of 1986, John and Naaman Eicher (the Eichers), principals of Champion Insurance Company (Champion), became dissatisfied with the performance of the then Commissioner of Insurance of the State of Louisiana, Sherman Bernard (Bernard). In an effort to unseat Bernard and find favor in the office of the Commissioner, the Eichers handpicked Green, a former employee of John Eicher at Key Underwriters, to run for the post.[2] The Eichers offered to match Green's then current income and to provide substantial funding for Green's campaign.[3]

---

[1] Euripides, *Medea* (431 B.C.) (Tr. Rex Warner), *as appearing in* The International Thesaurus of Quotations at 63 (*compiled by* Rhoda Thomas Tripp) (Softcover ed. 1987).

[2] Green had previously worked for the Eichers' at Key Underwriters, an insurance agency. Testimony at trial revealed Green regularly falsified state driving records for the Eichers' clients in order to get reduced rates for clients with bad driving records.

[3] Much of the incriminating evidence adduced at trial came in the form of testimony provided by Naaman Eicher, Patricia Eicher and Gary O'Neill (the Eichers' attorney) pursuant to plea agreements with the government.

2

Funding for Green's campaign arrived in the form of "loans" from William Hall (Hall) ($100,000), Harry Mey (Mey) ($25,000) and M.L.C. Services Inc. (MLC) ($25,000), a company owned by Carey Guidry.[4]  Testimony revealed each of the "loans" corresponded exactly to amounts "loaned" to Hall, Mey and M.L.C. (collectively the "intermediaries") by United Financial Services (United), a company owned by the Eichers.  Notes for the "loans" were simultaneously created between the intermediaries and the Green campaign and the intermediaries and United.  United informed the intermediaries that it would not seek repayment of the notes unless the Green campaign repaid the intermediaries. Although fundraisers were held on behalf of Green following his election, no payments of principal or interest were ever made to the intermediaries.  At the same time, however, some of the money raised was used to hire private investigators utilized in an attempt to gather information for the purpose of firing Max Mosley, the Chief Insurance Examiner and a target of the Eichers.  Green was entirely aware of these financing arrangements; he had been present at meetings during which these financing arrangements were planned.

In addition to the financing provided by the Eichers, Green was paid $2,000 per month to "run for office" and was

_____

[4]     Although charged with money laundering the three "loans", which totalled $150,000, testimony revealed that the Eichers channelled $2.1 million into Green's campaign.

provided with a fashion consultant.  The Eichers also arranged for Green's brother to be his driver, the Eichers paying the salary, and arranged for Green's brother to live in an apartment paid for by the Eichers.

Upon Green's assumption of duties as Commissioner of Insurance, a backlog of unpaid claims began to build up at Champion and complaints at the Insurance Commission mounted. James Fernandez (Fernandez), a supervisor in the Department of Insurance, repeatedly raised the issue of Champion's problems with Green, asking Green to take action against Champion.  Green's response to Fernandez' overtures was to remove Fernandez from the investigation of the claims involving Champion.  Green personally assumed control and responsibility for the investigation together with his close friend Tom Bentley.[5]  Although intense pleas from Fernandez continued,[6] Green did nothing about Champion's mounting problems.  In spite of Green's nonaction, official inquiry forms ("lulling letters") were sent by the Department of Insurance to each of Champion's complainants indicating that the Department of Insurance was investigating their complaints.  Champion claimants testified the lulling

_____

[5]     Bently is currently appealing his conviction for making false statements to a federal grand jury during the investigation of Champion and Green.  *United States v. Bently*, *appeal docketed*, No. 91-3768.

[6]     Fernandez' testimony was corroborated by at least two other witnesses from the Department of Insurance.

4

letters contributed to their decisions not to seek legal action against Champion.

In addition to the lulling letters, Green assisted the Eichers and Champion by interfering with an audit of Champion designed to remove the watchlisting of Champion by A.M. Best (Best), a national insurance rating company. Green appointed Malcolm Ward (Ward) to conduct the examination of Champion. When Ward attempted to expand the audit of Champion, Green intervened and limited it. Green guided the Department of Insurance in its urging of Best to withdraw the watchlisting of Champion. This action occurred via correspondence from the Department of Insurance drafted by Patti Eicher, John Eicher's wife.

Green's actions on behalf of the Eichers extended into other areas as well. He misled the Insurance Commissioner of Alabama, at the time conducting its own investigation of Champion, by indicating that Champion was in good condition despite knowledge of innumerable complaints against it. When Alabama insurance auditors sought to audit other companies controlled by the Eichers, Green, upon being informed by Naaman Eicher that one particular Eicher company, United Southern Underwriters, could not withstand auditing, prevented the auditing of that company.[7] When

---

[7] Green, overcoming the resistance of the Alabama auditors, succeeded in appointing Owen Guidry to control the Alabama audit of the Eicher companies. In regards to the audit of United Southern Underwriters, testimony revealed Green allayed Naaman Eicher's fears by stating "Don't worry,

Alabama eventually announced it would issue its own report of the examination as opposed to a joint report with Louisiana. The differences between the two reports was staggering, Louisiana reporting Champion to be solvent by $15 million and Alabama reporting it insolvent by $25 million.

Green personally licensed the Capital Insurance Company (Capital), a Communion company owned by the Eichers. The licensing permitted Capital to write multiple lines of insurance in Louisiana despite the fact that Capital could not sell insurance where it was originally licensed and thus failed to fulfill the requirements of Louisiana law. The $15 million solvency of Champion shown by the Louisiana report was due in part to a reinsurance contract Champion had with Capital. Under this contract, Capital supposedly accepted retroactive responsibility for certain claims against Champion. Testimony revealed, however, that if actually effectuated, this contract would require Capital to pay out $1.21 for every dollar of premium it received. Appellant was aware of the Eichers' plan to permit Champion to fail and to begin to write insurance in Louisiana through Capital.

### The Law

In his first point of error, Green contends the

I'll talk to Guidry. Quit getting so upset, so worked up." As indicated, United Southern Underwriters was not audited.

6

evidence was insufficient to permit the jury to convict him. In a challenge to the sufficiency of the evidence, this court must view the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the verdict. *United States v. Triplet*, 922 F.d 1174, 1177 (5th Cir.), cert. denied, 111 S.Ct. 2245 (1991). The question on appeal is whether a rational jury could have found the defendant guilty beyond a reasonable doubt and not every reasonable hypothesis of innocence need be excluded. *Id*. All credibility choices should be made in favor of the verdict. *United States v. Montemayor*, 703 F.2d 109, 115 (5th Cir.), *cert. denied*, 464 U.S. 822 (1983).

1. *Mail Fraud*

Green's argument regarding his conviction on the mail fraud counts is two-fold. First, he contends that because the lulling letters, sent to induce complaining Champion claimants into inaction, were sent by staff at the Department of Insurance and not by Green himself, there can be no reasonable conclusion other than Green did not have the specific intent to defraud required for conviction. Related to this, he points to evidence that the letters were sent as a matter of course and had similarly been sent by the previous Insurance Commissioner's administration. Secondly, Green contends the letters tended to expose the fraudulent scheme to keep Champion in business despite its troubled times and that thus the letters cannot, as a matter of law, constitute mail fraud.

7

To prove a case of mail fraud, the government must show that Green engaged in a scheme to defraud and used the mails to further this scheme. *United States v. Church*, 888 F.2d 20, 23 (5th Cir. 1989). A defendant need not actually be involved in the mailings directly; it is sufficient to show that "an individual does an act with the knowledge that the use of the mails will follow in the ordinary course of business. *United States v. Shaid*, 730 F.2d 225, 229 (5th Cir.), cert. denied, 469 U.S. 844 (1984). Nothing more is needed to show the defendant "caused" the mails to be used. *Id*. The evidence clearly established that Green knew the lulling letters would be sent out by his office. Thus, Green's argument that others did the actual mailing of the lulling letters and that he therefore does not have the requisite intent is without merit.

As to the evidence that the same types of letters had been sent by the previous administration, the Supreme Court has held that even routine letters, innocent in themselves, may form the basis of a mail fraud conviction. *Schmuck v. United States*, 109 S.Ct. 1443, 1448-49 (1989). The Court in *Schmuck* specifically rejected an argument virtually identical to the one put forth by Green. We need look no further in rejecting this aspect of Green's appeal.

As to the argument that the letters tended to expose Green's wrongdoing and thus cannot form the basis of mail fraud, *Schmuck* is again directly on point. As the Court observed:

8

> We also reject Schmuck's contention that mailings that someday may contribute to the uncovering of a fraudulent scheme cannot supply the mailing element of the mail fraud offense. The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud.

*Schmuck*, 109 S.Ct. at 1449-50.

There was testimony at trial that Green 1)participated in the scheme, 2) knew of its existence, 3) knew of the troubles Champion was experiencing and, 4) knew that his actions would lead to the mailing of the "routine" lulling letters. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found Green engaged in an illegal scheme and used the mails to further that scheme.

2. *Money Laundering*

The indictment upon which Green went to trial charged him with violation of 18 U.S.C. §1956(a)(1)(B)(i). This section reads in relevant part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-
>
>    (B) knowing that the transaction is involved in whole or in part-
>
>        (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity...
> The proceeds involved in Green's case are allegedly

9

proceeds of an illegal campaign bribery scheme.  Louisiana law provides:

> Bribery of a candidate is the giving, promising or offering to give, directly or *indirectly*, a campaign contribution to a candidate, political committee, or other person, or the accepting, soliciting, offering to accept, directly or indirectly, a campaign contribution, by a candidate, political committee or other person with the intention that the candidate will provide or influence another to provide the contributor *or another person*...anything of apparent present or prospective value.

La.Rev.Stat.Ann. §1469(A) (West Supp. 1992).  Loans are specifically excluded from the definition of "contribution" in the Louisiana Election Code. *Id*. at §1483(6)(c)(iv).

Green contends the fact that the $150,000 "loaned" by Hall, Mey and MLC came in the form of a loan excludes the transactions involved from the Louisiana campaign bribery statute.  Because no bribery occurred as a matter of law, there could have been no unlawful proceeds necessary for the money laundering counts.

In *State v. Brand*, 520 So.2d 114 (La. 1988), the defendant turned over confidential public records in a sting operation and she was charged with violating Louisiana's public bribery statute. 520 So.2d at 114-15.  The defendant alleged that the $100 she received for the records was a loan.  *Id*. at 116.  In rejecting the defendant's defense of a "loan", the Louisiana Supreme Court noted that the jury was free to disregard the defendant's version of the events based upon evidence of, *inter alia*, a damning recording of the defendant at the time of the delivery of the money and

the fact that no indication of repayment existed between the time of the loan and the defendant's arrest. *Id*.

If *Brand* reasonably stands for any proposition, it is that when the making of a loan is asserted as a defense to bribery, the defense can be shown to be false.  There is ample evidence upon which the jury could have concluded, as it apparently did, that the "loans" involved in this case were sham loans intended to be bribes.

The testimony of Naaman Eicher revealed that, long before any loans were contemplated, Eicher had indicated he would do "whatever it took to fund [Green's] campaign."  The Eichers were the principals of United, the financial institution making the loans to the intermediaries.  Moreover, there was testimony that the loans from United would not have to be paid back unless the campaign paid back the contributors first.  Indeed, Green himself testified that despite the fact that money had been gained by the campaign subsequent to the loans, no attempt was ever made to repay the loans.  Plainly, the jury could reasonably have determined that the loans were sham loans and thus that the campaign bribery statute had been violated.  Thus violated, the jury could have determined the proceeds were illegal and that the making of the loans through the intermediaries, third parties, was done knowing that the transaction was designed in whole or in part to conceal the source, ownership, or control of the proceeds.  Green's argument regarding his conviction for money laundering is without

11

merit.

Green's contention that the transfer of the proceeds by the Eichers through United to the intermediaries somehow caused the proceeds to loose their illegal character. He cites to the case of *United States v. Dove*, 629 F.2d 325 (4th Cir. 1980) for the proposition that the transfer of illegal money to an innocent person renders the funds legal. *Dove* involved the transfer of a stolen automobile to undercover police agents. *Id*. at 326. The defendants took possession from the agents and were charged with transportation of stolen goods in interstate commerce. *Id*. The court reversed on the ground that the agents held the automobile for the true owner. *Id*. at 329. The principle in *Dove*, that stolen goods recaptured by the police loose their status as stolen, is inapplicable to the present facts. There simply are no law enforcement agents involved in the transactions through which the Eichers channelled money to Green in order to buy his influence. Moreover, our reasoning regarding the ability of the jury to consider the entire transactions as sham loans casts doubt on whether the proceeds were, in fact, ever validly "transferred" into the possession of the intermediaries. The more applicable principle of law is that cited by the government, namely that one who has the requisite mental state to defraud but who uses another to commit his acts is nevertheless guilty of the offense. *See* 18 U.S.C.A. §2 (West 1969) (statutory basis of law of principals). Green's contentions as to this

12

point must be rejected.

Green finally contends there is insufficient evidence he "conducted" the transactions as alleged in the indictment. As the government points out, Green was tried as a direct principal and also under a theory that he aided and abetted the money laundering scheme. Green participated in negotiations of the financing of the his campaign. Moreover, there was testimony from one of the intermediaries, Hall, that Green personally dealt with him when Hall made the transactions involved. A reasonable jury could have found beyond a reasonable doubt that Green conducted the transactions involved.

3. *Conspiracy to Commit Mail Fraud*

Count 40 of the indictment charged Green with conspiracy to commit mail fraud. Green, in his brief on appeal, refers to his conspiracy conviction in one sentence and fails to provide any analysis whatsoever on the issue. Failure to prosecute an issue on appeal constitutes waiver of the issue. *United States v. Fagan*, 821 F.2d 1002, 1015 n.9 (5th Cir. 1987), *cert. denied*, 484 U.S. 1005 (1988); *United States v. Johnson*, 718 F.2d 1317, 1325 n.23 (5th Cir. 1983) (*en banc*). Green has waived any error as to his conviction for conspiracy. Even were we to conclude Green had properly raised the issue, our analysis of the sufficiency of the evidence as to Green's participation in the object offense requires affirmance. As indicated, evidence demonstrated Green's agreement with the Eichers to

13

assist them with their efforts to gain control of the Louisiana insurance industry.  Moreover, even were Green not a direct participant in the object offense, we would affirm because there is sufficient evidence to find him a coconspirator. *See Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946).  Greens contention, if it can be deemed such, that the evidence is insufficient to find him guilty of conspiracy, is totally unavailing.

4.  *Denial of Motions for Acquittal and New Trial*

As with Green's conviction for conspiracy, he has failed to brief the issue of the district court's refusal to grant his motions to acquit and for new trial.  He has thus waived these matters for appellate review. *See Fagan, supra; Johnson, supra; see also*, *United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989), *cert. denied*, 110 S.Ct. 2621 (1990) (*citing* F.R.App.P. 28(a)(4)).  Even assuming, *arguendo*, he had briefed these issues, our analysis of the sufficiency of the evidence sustaining the jury's verdict as to his convictions would preclude us from ruling in his favor on these matters. *See United States v. Gorel*, 622 F.2d 100, 106 (5th Cir. 1979), <u>cert. denied</u>, 445 U.S. 943 (1980) (court reviewing denial of motion for new trial views evidence in light most favorable to verdict and verdict entitled to all reasonable inferences drawn therefrom); *United States v. Varkonyi*, 611 F.2d 84, 85 (5th Cir.), *cert. denied*, 446 U.S. 945 (1980) (district court must determine, in ruling on motion for judgment of acquittal, whether

14

evidence is sufficient to find defendant guilty beyond reasonable doubt).

5. *Sufficiency of Indictment*

Green alleges the district court erred by admitting evidence that certain financial institutions were involved in interstate commerce. His argument is essentially that the indictment was jurisdictionally deficient because it failed to allege that the financial transactions upon which the money laundering counts were based affected interstate commerce. 18 U.S.C. §1956(c)(4) requires that the government show that the financial transaction upon which the money laundering count is based involved a financial institution engaged in interstate commerce. Green objected to the admission of testimony by two government witnesses to the effect that the two banks named in the indictment were involved in interstate commerce. He now contends the testimony constituted a material variance from the allegations contained in the indictment.

In a superseding indictment, the grand jury charged:

> C. On or about the dates listed below, in the Eastern District of Louisiana, DOUG GREEN, with the intent to promote the carrying on of the bribery of a candidate in violation of LSA-RS 18:1469, did conduct and attempt to conduct financial transactions, that is the receipt of funds from checks of intermediaries drawn on accounts at banks located in the Eastern District of Louisiana, knowing the funds he was to receive were the proceeds of an act of bribery of a candidate and that the transactions were designed to conceal that the source of the proceeds of these bribery funds were the Eichers and their companies:

15

```
COUNT    DATE        AMOUNT        CHECK #

37       8/24/87     $100,000      No. 346
                                   Hibernia National Bank
                                   Jefferson Parish

38       10/6/87     $25,000       No. 1425
                                   South Louisiana Bank

39       10/7/87     $25,000       No. 1730
                                   South Louisiana Bank
                                   Houma, La.
```

All in violation of Title 18, United States Code, Sections 1956 and 2.

"An indictment must allege every element of the crime charged." *United States v. Merritt*, 882 F.2d 916, 918 (5th Cir. 1989), *cert. denied*, 110 S.Ct. 2592 (1990). "An indictment is sufficient if (1) it contains the elements of the offense charged, (2) it `fairly informs' the defendant of the charge he must meet, and (3) there is no risk of future prosecutions for the same offense." *United States v. Arlen*, 947 F.2d 139, 144 (5th Cir. 1991) (*citing United States v. Gordon*, 780 F.2d 1165, 1169 (5th Cir. 1986)).[8] A conviction "will not be reversed for minor deficiencies that do not prejudice the accused." *Merritt*, 882 F.2d at 918. Thus, the validity of an indictment will be determined by reference to practical, not technical, considerations. *United States v. Mouton*, 657 F.2d 736, 739 (5th Cir. Unit A Sept. 1981) (*citing Varkonyi*, 645 F.2d at 456). This

---

[8] Here, as in *Arlen*, the appellant does not claim he is subject to double jeopardy and thus only the first two prongs are relevant. *See Arlen*, 947 F.2d at 144.

16

court's standard of review as to the sufficiency of the indictment is *de novo*. *United States v. Shelton*, 937 F.2d 140, 142 (5th Cir.), <u>cert. denied</u>, 112 S.Ct. 607 (1991).

Green relies on *Stirone v. United States*, 361 U.S. 212 (1960). *Stirone* involved an indictment alleging interference with interstate commerce by obstruction of transportation of sand to a steel mill. 361 U.S. at 213-14. At trial, the prosecutor sought to prove the defendant had also attempted to obstruct the exportation of steel from the mill. *Id*. at 214. Justice Black, writing for a unanimous court, reasoned:

> Ever since *Ex parte Bain*, 121 U.S. 1, was decided in 1887 it has been the rule that after an indictment has been returned, its charges may not be broadened through amendment except by the grand jury itself....
> ...
> The *Bain* case, which has never been disproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him. [*citations omitted*]. Yet the court did that in this case....
> ...
> Here, as in the *Bain* case, we cannot know whether the grand jury would have included in its indictment a charge that commerce in steel from a nonexistent steel mill had been interfered with. Yet because of the court's admission of evidence and under its charge this might have been the basis upon which the trial jury convicted petitioner. If so, he was convicted on a charge the grand jury never made against him.

*Stirone*, 361 U.S. at 215-19.

*Stirone* is inapplicable to the facts of Green's case. As we explained in *United States v. Young*, 730 F.2d 221, 223 (5th Cir. 1984),

17

> *Stirone* requires that courts distinguish between constructive amendments of the indictment, which are reversible *per se*, and variances between indictment and proof, which are evaluated under the harmless error doctrine. The accepted test is that a constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. [*citations omitted*]. In such cases reversal is automatic, because the defendant may have been convicted on a ground not charged in the indictment. *See Stirone*, 361 U.S. at 217, 219, 80 S.Ct. at 273, 274; [*remaining citations omitted*]. If, on the other hand, the variation between proof and indictment does not effectively modify an essential element of the offense charged, "the trial court's refusal to restrict the jury charge to the words of the indictment is merely another of the flaws in trial that mar its perfection but do not prejudice the defendant." [*United States v.*] *Ylda*, 653 F.2d [912,][]914 [(5th Cir. 1981)](footnote omitted).
>
> .....
>
> Unlike [*Stirone* and other cases omitted herein], the case before us involves a single set of facts. Mr. Young was not indicted for receiving one particular firearm and then convicted for receiving another. The factual basis for the indictment is identical to that for the conviction. Hence it is *not* possible that the defendant has been convicted for an offense not charged in the indictment. <u>Stirone</u> and <u>Salinas II</u>[9] are not applicable.

*Young*, 730 F.2d at 223-24. Here, as in *Young*, Green's conviction is based upon the same set of money laundering facts as those alleged in the indictment; he has not been convicted of a different offense nor could the introduction of the testimony regarding interstate commerce have created

---

[9] *United States v. Salinas*, 654 F.2d 319 (5th Cir. Unit A Aug. 1981), affirmed in part, reversed in part *sub nom*, *United States v. Adamson*, 700 F.2d 953 (Former 5th Cir. Unit B), <u>cert. denied</u>, 464 U.S. 833 (1983).

a new offense.  Thus, *Stirone* is inapplicable.

Green's challenge is more akin to an allegation that the indictment fails to state an offense because an essential element thereof has not been alleged. *See Mouton*, 657 F.2d at 739 (indictment sufficient if it contains essential elements of offense).  His position is that an allegation of an affect upon interstate commerce is jurisdictional and, as such, is an essential element of the offense of money laundering.  If an allegation of interstate commerce is jurisdictional, then it is essential. *See Young*, 730 F.2d at 224 ("The particular predicate for jurisdiction is an essential element of any offense.") (*citing McRary*, 665 F.2d at 678-79).

18 U.S.C.A. § 1956(a)(1) requires that a defendant participate or attempt to participate in a financial transaction; this is clearly an essential element of the offense.  Subsection (c)(4) provides the definition of the term "financial transaction":

> (4)  the term "financial transaction" means (A) a transaction (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, which in any way or degree affects interstate or foreign commerce, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

The Eighth Circuit has addressed a situation similar to that we face here.  In *United States v. Lucas*, 932 F.2d 1210 (8th Cir.), cert. denied, 112 S.Ct. 199, 349, 399, 609

19

(1991) the defendants were charged with, *inter alia*, violating the federal money laundering statute. 932 F.2d at 1213. Following conviction, the defendants appealed, arguing the money laundering counts failed to state an offense because they failed to allege any nexus between the defendants' conduct and interstate commerce. *Id*. at 1218. The panel observed the defendants had not made their challenge to the indictment until after the close of the government's case-in-chief. Although it noted that defendants are permitted to raise arguments as to the validity of an indictment at any time, *Id*. (*citing United States v. Clark*, 646 F.2d 1259, 1262 (8th Cir. 1981)), the court quoted Ninth Circuit precedent for the proposition that indictments are liberally construed in favor of validity where they are tardily challenged. *Id*. (*quoting United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir. 1976), *cert. denied*, 429 U.S. 1099 (1977)).

Applying its standards of review, the Eighth Circuit observed:

> We find that counts XVII, XIX, and XXI, reasonably construed, do allege a nexus with interstate commerce. We therefore do not reach the question of whether an allegation of a "nexus with interstate commerce" is an essential element in a charge under 18 U.S.C. § 1956 for laundering money. All three counts refer to specific acts of money laundering that gave rise to the charges in each of those counts. Counts XIX and XXI refer to conduct that is related expressly to the construction of a shopping mall....Likewise, count XVII refers to the purchase of real estate...and although it does not expressly state that it is to be used in the construction of the mall, the inference that it is to

20

> be put to such a use is, in the circumstances of this case, quite reasonable.
>
> Furthermore, although counts XVII, XIX, and XXI do not expressly mention the words "interstate commerce," it seems apparent that an effect upon interstate commence is an inevitable incident of the construction of a shopping mall. Consequently, we believe that allegations that reasonably implicate the construction of such an establishment are sufficient to constitute allegations of an effect upon interstate commerce.

*Lucas*, 932 F.2d at 1219.

Based upon the standards of review of the sufficiency of an indictment discussed above, *see supra* at p.16-17, we find Greens' case indistinguishable from that in *Lucas*. We therefore conclude that we need not reach the question of whether an allegation of an affect upon interstate commerce is jurisdictional and, thus, an essential element of the offense. Green's indictment plainly alleges that banks were involved in the transactions at issue. It further delineates the specific banks involved. At oral argument, Green's counsel admitted he had never heard of a bank that did not affect interstate commerce in some way; nor have we. We hold, as in *Lucas*, that the allegations of the involvement of banks contained in this indictment are sufficient to reasonably appraise Green of an affect upon interstate commerce. Green's contentions are meritless.

6. *Obstruction of Justice*

At sentencing, the district court imposed a two point enhancement for obstruction of justice as to the conspiracy to commit mail fraud and mail fraud convictions. The court

21

stated its actions were premised on the evidence of Green's interference with the Alabama investigation of the Eicher companies. The court included a well written statement of reasons and supplemental statement of reasons for its actions. It reasoned Green's crimes had done significant damage to the electoral process and irreparably damaged many families and individuals who would never be able to be compensated for personal and property losses.

Green alleges the court erred by accepting paragraph 53 of the presentence report, obstruction of justice, and paragraph 54 of the presentence report, failure to produce documents. As to paragraph 54, the district court agreed with Green's objections thereto and plainly stated it would not consider the allegations contained therein. Thus, Green's complaint to this paragraph has no merit. As to paragraph 53, Green argues the conduct alleged to have been the basis for the obstruction of justice is part of the object offense. He suggests an enhancement for obstruction of justice may be based only upon acts obstructing the investigation of the object offense, not upon acts forming the basis of the object offense itself. He points to the fact that the behavior alleged to form the basis of the enhancement was behavior disputed at trial and upon which he was convicted. The district court, in its supplemental statement, concluded that Green had indeed obstructed justice and referred to the proof of this obstruction adduced at trial. The district court did not err.

22

Section 3C1.1 of the Sentencing Guidelines provides that "[i]f the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the *investigation* or prosecution of the instant offense, increase the offense level...." (*emphasis added*). In *United States v. Cain*, 881 F.2d 980, 982 (11th Cir. 1989), the appellant argued obstruction of justice applied only to post-offense conduct. The Eleventh Circuit rejected the contention, citing Fifth Circuit precedent. 881 F.2d at 982 (*citing United States v. Galvan-Garcia*, 872 F.2d 638, 641 (5th Cir.), cert. denied, 493 U.S. 857 (1989). In *Galvan-Garcia*, this court upheld an enhancement for obstruction of justice based of the defendant's attempted concealment of marijuana by throwing bags of the contraband out of his automobile while being chased by the police. Here, Green does not challenge the district court's factual finding that the obstruction occurred. Because this was obstruction of an investigation which would have led to the prosecution of Green for the offense of mail fraud, the district court did not err.

7. *Reasonableness of Sentence*

There has never been any dispute that the offense of money laundering as charged in Green's indictment occurred pre-guidelines.[10] Green argues the district court's

---

[10] The effective date of the Sentencing Guidelines was November 1, 1987. *United States v. Garcia*, 903 F.2d 1022, 1025 (5th Cir.), *cert. denied*, 111 S.Ct. 364 (1990).

sentence of twenty years on each of three counts is "plainly unreasonable". He cites to no authority whatsoever to support his assertion that a sentence of twenty years for the offenses charged is "plainly unreasonable".

A district court has great discretion in imposing a sentence for pre-guideline offenses. *United States v. Helms*, 897 F.2d 1293, 1299 (5th Cir.), cert. denied, 111 S.Ct. 257 (1990) (*citing United States v. Nichols*, 695 F.2d 86 (5th Cir. 1982)). There is simply no basis for us to conclude the sentence imposed here constitutes an abuse of that discretion. We note the sentences were ordered to run concurrently, not consecutively, and thus the district court actually gave Green only one third of the time he could have received. *See United States v. Garcia*, 903 F.2d 1022, 1025 (5th Cir.), *cert. denied*, 111 S.Ct. 364 (1990) ("[T]he sentencing court has unfettered discretion to impose sentences on pre-guideline counts consecutively or concurrently.") (*quoting United States v. Watford*, 894 F.2d 665, 669 (4th Cir. 1990) (opinion by Judge Wilkins, Chairman, United States Sentencing Commission)). Moreover, we reiterate the findings of the district court that Green's crimes were particularly egregious, injuring countless persons by depriving them of their rightful compensation for personal injury and property loss. Finally, we note that the sentence of twenty years is not greater than the

statutory maximum for the offense of money laundering.  18 U.S.C.A. §1956(a)(1).  The sentence imposed is not "plainly unreasonable" and we reject any suggestions to the contrary.


## CONCLUSION

We have examined all of Green's remaining issues and conclude they are so lacking in merit as to not warrant discussion.  Because we find no error in the trial below, Green's convictions and sentences are in all respects AFFIRMED.